UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Crim. No. 6:21-cr-00013-GFVT-HAI |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ROBERT TAYLOR, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants Taylor, Barnett, Grenkoski, and Herrell move the Court to hold an evidentiary hearing on, and dismiss this matter due to, alleged violations of their attorney-client privilege and the work-product doctrine. [R. 258; R. 274; R. 362.] Defendants Taylor and Barnett filed their Motion to Dismiss first, claiming that federal officers seized privileged information when executing search warrants at their home and office and that prosecutors and agents have been irredeemably exposed to that information. [R. 258 at 1-2.] Defendant Herrell moved to join that Motion and the Reply in support. [R. 274; R. 354.] Defendant Grenkoski filed his own Motion to Dismiss, the majority of which copies Dr. Taylor and Ms. Barnett's Motion. [*See* R. 362 at 1 n.1 ("Arguments A through C were previously asserted by Defendant Taylor and are used here with permission.").] Dr. Herrell's motions to join [R. 274; R. 354] will be **GRANTED** but for the reasons stated below, the Motions to Dismiss [R. 258; R 362] will be **DENIED**.

I

The eleven defendants in this matter are charged with a total of twenty-seven counts including money laundering, health care and wire fraud, unlawful distribution of controlled substances, falsification of medical records, and various conspiracies. [R. 1.] Dr. Taylor

founded EHC medical offices, which employed Defendants Barnett, Herrell, Grenkoski, McFarlane, Bidawid, Cirelli, Misra, and Rasberry. *Id.* at 6-7. All but Ms. Barnett were also physicians. *Id.* Defendants Powers and Bunch were also charged, both of whom are individuals residing in Kentucky. *Id.* The Government's overarching allegation is that the individuals running EHC were working together to distribute controlled substances, such as buprenorphine and benzodiazepines, outside of the scope of legitimate medical practice. *See id.* at 7-8. This resulted in or necessitated several other criminal acts and conspiracies, such as falsification of medical records, defrauding healthcare benefit programs including Medicare and Medicaid, and engaging in financial transactions using the proceeds of unlawful activity. *Id.* at 8-32.

Dr. Taylor and Ms. Barnett, joined by Dr. Herrell and Dr. Grenkoski, now move to dismiss the charges against them because the Government has allegedly not properly protected seized privileged materials. [R. 258 at 3.[1]] In December 2018, federal and state agents executed a search warrant at Dr. Taylor and Ms. Barnett's home. *Id.* The investigation report indicates that agents seized "laptops, two cell phones, documents related to EHC, U.S. currency, gabapentin, and marijuana." [R. 198-1 at 2.] One specific concern revolves around DEA agent Jared Sullivan and IRS agent Crystal Centers were all present during the execution. *Id.* at 8. The Movants represent that Agents Sullivan and Centers were familiar with this investigation and would have known that E.J. Saad was an attorney for EHC. [R. 258 at 3-4.] E.J. Saad was sending text messages to Dr. Taylor's phone, which was then seized, during the search. *Id.* Dr. Grenkoski's home was also searched in December 2018. [R. 284-1.] He states his laptops and

---

[1] Dr. Grenkoski submitted his own Motion to Dismiss, which is a nearly identical copy of Dr. Taylor and Ms. Barnett's Motion. [R. 362.] He states that the majority of his Motion was "previously asserted" by them and is being "used with permission." Throughout this Order, the Court will cite to Dr. Taylor and Ms. Barnett's Motion, not Dr. Grenkoski's, when referring to the Movants' arguments. The Court recognizes that Dr. Grenkoski raises these arguments as well.

2

cell phones were seized during this search, though the DEA investigation report lists only an interview with Dr. Grenkoski as evidence resulting from the search. *Id.* Nevertheless, the Government confirmed that it possesses data from cell phones, email accounts, and computers belonging to Dr. Taylor, Ms. Barnett, Dr. Herrell, and Dr. Grenkoski. [R. 258-7 at 1.]

Following the search, Dr. Taylor claims his counsel notified the Government multiple times that privileged information was located in the seized data and provided a list of attorneys who had communicated with Dr. Taylor. [R. 258 at 5-6.] In response, the Government indicated that it had started the filter review process and were awaiting assignment of a filter attorney. [R. 240-1 at 1.] In June 2019, the filter attorney confirmed to Dr. Taylor's counsel that a filter process was in place. [R. 240-2.] This filter process utilized a non-prosecuting Assistant United States Attorney and litigation support staff, who used search terms to sort out potentially privileged materials. [R. 258-7 at 2; *see also* R. 237 at 4-6.]

In May 2021, the Government informed the Defendants that the filter review process was complete and proposed a protocol for producing the seized evidence. [R. 258-7.] It stated that the prosecuting AUSAs did not access the data before the filter process was implemented or while the process was ongoing. *Id.* However, the filter attorney did allow DEA agents to "conduct a targeted review of certain communications with obvious non-attorney contacts." *Id.* The agents were told to cease their review if they saw potentially-privileged communications. *Id.* They confirmed after the review that they did not encounter any privileged communications. *Id.* Despite the Government's assurances, the Movants contend that DEA agents reviewed Ms. Barnett's email accounts with no privilege precautions and USAO litigation staff was exposed to privileged materials. [R. 258 at 9-10.]

Ultimately, the Movants believe that the Government intruded into their privileged communications, creating an actual conflict for the current prosecution team and necessitating dismissal of the indictment or new prosecutors and investigating agents. *See id.* at 15. The Government argues that the Movants cannot be granted relief for a privilege violation without identifying any specific privileged communication or establishing resulting prejudice. [R. 312.] The Motion is fully briefed and ripe for review.

## II

As the oldest established privilege, attorney-client privilege serves as "a necessary foundation for the adversarial system of justice." *In re Lott*, 424 F.3d 446, 450 (6th Cir. 2005). The party asserting attorney-client privilege bears the burden of establishing the existence of that privilege. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999). Attorneys' and defendants' work-product is also privileged if it was "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A); *see also South Fifth Towers, LLC, v. Aspen Ins. UK, Ltd.*, 763 F. App'x 401, 405 (6th Cir. 2019).

The attorney-client privilege is itself an *evidentiary* privilege created through the common law, which does not implicate the constitution. *See Dye v. Hofbauer*, 197 Fed. App'x 378, 383 (6th Cir. 2006). The most common remedy for a breach of the privilege is to exclude the privileged materials at trial. However, a privilege violation can arise to infringement of the Sixth Amendment right to counsel if the privilege holder can show that the Government intruded on the attorney-client relationship *and* that prejudice resulted. *United States v. Dobson*, 626 Fed. App'x 117, 124 (6th Cir. 2015). Proof of resulting prejudice is crucial. Even if Government agents *intentionally* intruded into privileged material, the privilege-holder is only entitled to relief if they can show that the prosecution's improper use of the privileged materials prejudiced

4

them. *United States v. Clark*, 319 Fed. App'x 395, 399 (6th Cir. 2009). If a violation is established, the remedy should be "tailor[ed]" and "appropriate in the circumstances." *United States v. Morrison*, 449 U.S. 361, 365 (1981). The remedy is typically "limited to denying the prosecution the fruits of its transgression," often by suppressing evidence. *Id.* at 366.

The Government frequently comes to possess materials that may include privileged items in the course of its investigations. To avoid intrusions resulting in prejudice, it implements a "taint team" filter procedure to sort out privileged and potentially-privileged materials. *See In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006). The taint team is typically comprised of Assistant United States Attorneys who are not involved in the prosecution. *See United States v. Coffman*, 574 Fed. App'x 541, 564-65 (6th Cir. 2014). This procedure is commonly utilized and is permissible so long as the privilege-holders can challenge the taint team's privilege determinations. *In re Grand Jury Subpoenas*, 454 F.3d at 523.

In this matter, the Government initiated a filter process in April 2019. [R. 237 at 4.] The filter attorney, supported by U.S. Attorney's Office litigation support staff and the DEA electronic evidence laboratory, used search terms to find potentially privileged materials. *Id.* at 5. Non-privileged materials were disclosed to the prosecution team, while the privileged and potentially-privileged materials were not disclosed. *Id.* at 4-6. The discovery protocol allows the privilege holders to challenge the Government's privilege determinations. [R. 290; R. 291.] The Movants argue for dismissal of the Indictment because (1) the Government's treatment of the privileged materials did not sufficiently protect their privilege, (2) a taint team should have been imposed before the search warrant was executed, and (3) the filter procedure cannot cure existing, or prevent future, privilege violations. [R. 258.] They also request an evidentiary

5

hearing on the privilege violations and either request or inform the Court they plan to request disqualification of the prosecution team. *See id.* at 13, 17.

A

First, the Movants argue that the Government's treatment of seized materials violated attorney-client and work product privileges.[2] [R. 258 at 14-17.] They claim the violations were collectively so pervasive that dismissal of the Indictment is required. *Id.* The Government did not respond to any specific claim, instead arguing that the Movants fail to identify specific privileged communications or establish prejudice resulting from the Government's use of the communication. [R. 312 at 8-15.]

The Movants seek dismissal of the Indictment, not suppression of privileged materials, so they must show a privilege violation arising to a Sixth Amendment violation. The Sixth Circuit has definitively held that "defendants are entitled to relief in connection with the prosecution's improper use of . . . protected attorney-client privilege *only* if prejudice is shown." *Clark*, 319 Fed. App'x at 399 (citing *Bishop v. Rose*, 701 F.2d 1150, 1157 (6th Cir. 1983)). Dismissal of the Indictment is inappropriate "absent *demonstrable* prejudice." *Id.* (quoting *Morrison*, 449 U.S. at 365). If the Movants demonstrate prejudice, they still must establish that dismissing the Indictment is the appropriate remedy. *See Morrison*, 449 U.S. at 364-65.

In their Motion to Dismiss, the Movants broadly assert that "for years, government agents and employees have freely reviewed and/or had access to materials containing attorney-client privileged materials and work-product materials with no court oversight." [R. 258 at 16.] The

---

[2] The Movants base their motion on both the attorney-client privilege and the work product doctrine. They do not identify any specific privileged material, so there are no distinctions between alleged violations of the two protections. Because the parties emphasize attorney client privilege, the Court will refer to that privilege throughout the Order rather than the work-product doctrine. This does not mean that the Court only analyzed whether the Movants established an attorney-client privilege; they similarly failed to identify any documents protected by the work product doctrine.

6

Court agrees with the Government's position that the Movants failed to show any specific privileged material to which government employees were exposed or establish any resulting prejudice.[3]  *Id.* at 14-17.  Notably, the Movants could have identified privileged materials—if they exist—because the Government shared the electronic data and its privilege designations with them.  [R. 237.]  They did not do so in their initial Motion or in response to the Government's argument.  [R. 345.]  They instead argue that the Government's understanding of prejudice is too narrow and that they are not required to show specific privilege violations.  *Id.* at 4-10.  They believe "threatened prejudice" is sufficient to establish a Sixth Amendment violation, framing *In re Grand Jury Subpoenas* as "rejecting the government's protocol based on potential privilege violations."  *Id.* at 4, 6.

The Movants' position is not an accurate representation of *In re Grand Jury Subpoenas*.  True, the Sixth Circuit recognized inherent risks posed by the use of taint teams which, while separate from the prosecution team, are members of the same prosecuting body and have some degree of interest in pursuing the investigation.  454 F.3d at 523.  But it held that the remedy for this risk is to allow privilege-holders to challenge all of the taint team's privilege determinations, not just those deemed clearly or potentially privileged.  *Id.*  This provides the necessary "check . . . against the possibility that the government's team might make some false negative conclusions."  *Id.*  The inevitable threat of prejudice did not warrant dismissing the Indictment; it merely required the privilege-holders be able to review all of the privilege determinations.[4]  The discovery protocol in this matter grants the Movants that opportunity.  [R. 290; R. 291.]

---

[3] The only specific potential exposure raised is that Agent Sullivan saw texts from who he knew to be EHC's lawyer incoming to Dr. Taylor's phone, which was then seized, during the search of his home.  [R. 258 at 4.]  Agent Sullivan stated he did not read the contents of those messages.  [R. 198-1 at 7.]  Further, the Movants did not claim that those texts were in fact privileged.  The Agent's conduct protected, rather than violated, the Movants' privilege.  His conduct does not amount to a violation.

[4] The Movants seem to recognize that *In re Grand Jury Subpoenas* arose in a different context than the one at hand but argue that its reasoning has been referenced in other contexts.  [R. 345 at 6 n.10.]  In *United States v. Paulus*, the

The Movants state that this matter is even more serious than that in *In re Grand Jury Subpoenas*, claiming "the violation is not just theoretical because information has been provided to the trial team without a third-party review." [R. 345 at 6.] This raises the fundamental issue: what information? The Movants did not identify any specific privileged communication, nor show that any were disclosed to the prosecution. Instead, they ask the Court to assume that a violation occurred because (1) the Government did not consult with defense counsel before disclosing documents deemed not privileged to prosecutors or (2) "true information segregation" did not occur, constituting "sharing among the trial team." *Id.* at 8.

Disclosing non-privileged documents to prosecutors does not violate attorney-client privilege. The Court cannot assume that a violation occurred simply because the Defendants were not consulted before non-privileged materials were disclosed to the prosecution. If privileged material was mistakenly deemed non-privileged, the existing discovery protocol (which is being fiercely litigated) allows the Movants to challenge that designation. [R. 291 at 2-3.]

The Movants do not establish that "true information segregation" did not occur. [R. 345 at 6.] This claim is based in part on the fact that DEA agents were allowed to review communications before they were filtered. *Id.* However, their review was limited to materials with "obvious non-attorney contacts" and no "reasonable probability" they contained privileged material. [R. 258-7 at 2.] The agents were initially warned to cease their review if they encountered anything potentially privileged and they confirmed afterwards that they did not

---

case was cited as an example of the fact that "privilege logs aren't unheard of in criminal proceedings." 952 F.3d 717, 724 (6th Cir. 2020). In *United States v. Patel*, the case was cited to support the "inherent danger in allowing government agents on a filter team to listen to a target's conversations with his attorneys without minimization." 579 Fed. App'x 449, 460 (6th Cir. 2014). The case has certainly been referenced outside of the grand jury context, but the Movants cite, and the Court is aware of, no case in which it was extended to hold that threatened, unspecified prejudice is sufficient to dismiss an Indictment.

encounter such material. *Id.* The Movants also believe the prosecution team was tainted because "litigation support staff" applied search terms to the materials to discover anything potentially privileged. [R. 237 at 5-6.] Their argument assumes that these staff members are a part of the trial team, but the Government states that they "are not responsible for any aspect of the prosecution" and "never communicated the contents of any [privileged] material to the prosecution team or otherwise used the material to the Government's advantage." [R. 312 at 8.] No evidence suggests effective "sharing among the trial team" occurred.

Ultimately, the Movants did not satisfy their burden of showing any privilege violation. Even if there were evidence of a violation, dismissal is not necessarily warranted. *Morrison*, 449 U.S. at 365 ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.") Dismissal has only been suggested as an appropriate remedy in "extreme circumstances" such as the government destroying or permanently losing potentially exculpatory evidence. *Shillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995) (citing *California v. Trombetta*, 467 U.S. 479, 486–87, (1984); *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994)). This case does not present any comparable circumstances,[5] so dismissal is not justified.[6] *See United States v. Moses*, 337 Fed. App'x 443, 449 (6th Cir. 2009) (affirming district court's denial of a motion to

---

[5] The Sixth circuit has also noted that the standard announced in *Shillinger* is "admittedly stricter than this circuit's showing of prejudice requirement." *Moses*, 337 Fed. App'x at 449.

[6] The Movants make additional claims which the Court must address. They claim that they were never "given the opportunity to review any documents and their designations." [R. 258 at 15.] This review process is established in the discovery protocol and will begin once the numerous challenges to that protocol are resolved. [*See* R. 290.] The Movants also suggest that the Government waited years between being informed of the existence of privileged materials and implementing a taint team. [R. 258 at 15.] The searches occurred in December 2018, the privilege warnings were sent in March 2019, and the filter attorney was assigned in April 2019. *Id.* at 6. Finally, they state that "the prosecution and investigation teams have apparently refused to implement or document a protocol and process with unrelated personnel properly trained and executing protections for the individuals and businesses subjected to the invasive search and seizure." [R. 258 at 17.] The Government explained that the individuals involved in the filter procedure were unrelated to the prosecution team, so this is mistaken. [R. 237 at 4-5; R. 312 at 8.]

dismiss the indictment when the defendant did not produce evidence that a member of the prosecution team was exposed to privileged material).

B

The Movants also believe that dismissal is warranted because a taint team was not in place before agents executed the search warrant for their residence. [R. 258 at 17-20.] They claim that "proper taint procedures" would have required non-case agents to execute the warrant. *Id.* at 17-18. These procedures were not used, so they allege "the government's violation of the attorney-client privilege pervades the entire case." *Id.* at 20. The Government did not specifically respond to this argument. Rather, it argues the Movants cannot claim a Sixth Amendment violation without identifying specific privileged material or establishing prejudice. [R. 312 at 8-15.]

The Movants' assertion that taint teams are required before execution of a search warrant is unfounded. They cite *In re Grand Jury Subpoenas* in support, which explains how federal investigations commonly employ taint teams:

> Government taint teams seem to be used primarily in limited, exigent circumstances in which government officials have already obtained the physical control of potentially-privileged documents through the exercise of a search warrant. In such cases, the potentially-privileged documents are already in the government's possession, and so the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege.

454 F.3d at 522. Per the Sixth Circuit, taint teams are "primarily" used *after* a search warrant is executed and the potentially-privileged materials are in the government's possession. *Id.* This directly conflicts with the Movants' belief that their Indictment should be dismissed because a taint team was not in place before the search of their residences and offices. Notably, they cite to no case establishing as such. [*See* R. 258 at 17-20.] *In re Grand Jury Subpoenas* does note an "obvious flaw in the taint team procedure: the government's fox is left in charge of the

10

appellants' henhouse, and may err by neglect or malice, as well as by honest differences of opinion." 454 F.3d at 522. But the Sixth Circuit did not reach the Movants' conclusion that because of this inherent flaw, "taint team procedures must be established in advance of any search and seizure." [R. 258 at 18.] Rather, it found that the privilege holders must have an opportunity to review the taint team's privilege determinations. *In re Grand Jury Subpoenas*, 454 F.3d at 522. The Movants have this opportunity under the existing discovery protocol. [R. 290; R. 291.]

Beyond *In re Grand Jury Subpoenas*, which directly conflicts with their position, the Movants rely only on broad pronouncements about the importance of fairness and respecting attorney-client privilege. They first cite to the Justice Manual (previously, the United States Attorney's Manual), which encourages federal prosecutors to "take the least intrusive approach" "to avoid impinging on valid attorney-client relationships." [R. 258 at 19 (quoting Justice Manual § 9-13.420, and citing § 9-19.220) (internal quotations omitted).] Not only is this Manual not binding law, it also only encourages investigators to employ taint teams before executing search warrants when searching the premises of an attorney subject to a criminal investigation.[7] Justice Manual § 9-13.420(E).

The other cited cases broadly comment on the importance of legal proceedings appearing just and fair. [R. 258 at 20 (citing *Wheat v. United States*, 486 U.S. 153 (1988); *United States v. Johnson*, 690 F.2d 638 (7th Cir. 1982)).] The Court agrees with those pronouncements, but neither case supports the Movants' position that it is fundamentally unfair to employ a taint team after executing a search warrant. Finally, they claim dismissal is warranted because "the

---

[7] Neither of the cited provisions applies to the facts at hand. § 9-13.420 governs "searches of premises of subject attorneys." § 9-19.220 governs situations in which "privileged materials sought are in possession of a *disinterested third party* physician, lawyer, or clergyman" (emphasis added). The Movants are neither "subject attorneys" (attorneys subject to a criminal investigation), nor are they disinterested third parties.

11

government's violation of the attorney-client privilege pervades the entire case." *Id.* Again, they do not provide any specific instance in which case agents, investigators, or prosecutors were exposed to privileged material. There is no factual basis for the claim that violations occurred at all, let alone that violations "pervade the entire case." The Court declines to dismiss the Indictment because a taint team was not in place before the Movants' residence was searched.

## C

The Movants present a brief argument that the filter procedure is insufficient to "cure past violations or prevent further violations." [R. 258 at 20.] The premise of this argument is unclear because the filter procedure has already occurred, so it cannot—and is not intended to—"cure" or "prevent" any violations. [*See* R. 258-7.] They largely repeat arguments discussed above. They claim that the filter process "merely changes the identity of the government attorneys and agents who first review [privileged] information," those attorneys and agents cannot be expected to ignore evidence of other crimes they find, and the prosecution and investigation team had "unimpeded exposure" to privileged information. [R. 258 at 20.]

First, taint teams are frequently employed to balance the Government's interest in investigating cases with subjects' interest in maintaining attorney-client privilege. *In re Grand Jury Subpoenas*, 454 F.3d at 523. The Government is permitted to allow non-prosecuting agents and attorneys to review potentially-privileged material, as long as the privilege holders can later review and challenge their privilege determinations. *Id.* The Movants can do so under the discovery protocol. [R. 290; R. 291.] Their contention that *no* Government employees should be engaged in this process is unfounded. Second, evidence of other crimes discovered during the privilege review process would likely fall under the crime-fraud exception to attorney-client privilege. If not, and the Government pursued criminal charges based on privileged information,

12

there may be grounds to dismiss that second action. *See, e.g. United States v. Warshak*, 631 F.3d 266, 292 (6th Cir. 2010). This distant possibility does not mean taint teams should never be used. Finally, the Movants did not show a single instance of the prosecution team being exposed to privileged material, let alone "unimpeded exposure." The only potential exposure occurred when agents involved in the prosecution engaged in a minimal review of electronic data. [R. 258-7 at 2.] This review was strictly limited to minimize exposure to privileged materials and the agents confirmed that they did not see such materials. These additional concerns raised by the Movants do not warrant dismissal of the Indictment.

### D

The Movants request an evidentiary hearing "to determine what materials have been reviewed by the government's case agents and prosecutors." [R. 258 at 17.] This request is not specifically brought under *Kastigar*, but that case provides a helpful framework. *Kastigar* involved prosecution of a witness who, in a previous criminal prosecution, had been compelled to give incriminating testimony pursuant to a grant of statutory immunity. *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972). In that circumstance, the Supreme Court held that the Government must prove at an evidentiary hearing that its evidence was obtained from independent sources, not the compelled testimony. *Id*. The Sixth Circuit suggested in *dicta* that a *Kastigar*-like hearing might be appropriate in the context of privileged materials provided to a grand jury. *In re Grand Jury Subpoenas*, 454 F.3d at 517. The topic was revisited several years later, when a criminal defendant requested a *Kastigar* hearing requiring the Government prove its evidence was not a result of privileged materials. *Warshak*, 631 F.3d at 292. Because the defendant "raised enough of a question" about Government agents' treatment of privileged materials, the district court held a "*Kastigar*-like hearing" to determine the extent of their

13

exposure. *Id.* (quotations omitted). The defendants appealed the contours of that hearing. *Id.* Ultimately, the Sixth Circuit determined that when evidence is not the product of compelled testimony, and particularly when there is no indication that the Government directly used privileged communications in their investigation, a full *Kastigar* hearing is not required. *Id.* at 294–95.

Even if a *Kastigar* hearing were applicable to this issue, the Movants would not have met their burden to trigger such a hearing. A defendant must describe actual use of protected information (in *Kastigar*, compelled testimony) to obtain a hearing. *United States v. Ford*, 176 F.3d 376, 381 (6th Cir. 1999). As explained above, the Movants have not identified any specific privileged materials or use by the prosecution team. They argue they should not be required to wait until privileged materials are used to obtain relief for such a violation. [R. 354 at 4.] This identifies a relevant gap in comparing the present circumstance to that in *Kastigar*. The Court agrees that the Government should not need to use privileged materials to the Movants' detriment before they could obtain even a hearing. But the Movants do need to identify privileged materials to which the prosecution team could have been exposed before a hearing on the nature of the exposure is necessary.

Ultimately, the Movants did not present any evidence of misconduct or negligence, and therefore failed to raise a sufficient question as to the Government's handling of potentially privileged information. *Warshak*, 631 F.3d at 292. The Court finds an evidentiary hearing is not warranted and denies the request. *See also United States v. Sharma*, 2019 WL 3802223, at *5-6 (S.D.N.Y. Aug. 13, 2019) (denying a hearing on privilege violations when the movant did not show a factual connection between the privileged information and the prosecution); *United States v. Lanier*, 2022 WL 2953149, at *6 (D. Nev. Jul. 25, 2022) (denying a second evidentiary

14

hearing because the movant did not meet their *prima facie* burden of showing the prosecution used privileged information).

E

Finally, the Movants arguably ask the Court to disqualify the prosecution team. It is unclear whether they intended this request to be included in the instant Motion or if they are merely warning the Court that they intend to make it if the Motion to Dismiss is denied. [*Compare* R. 258 at 2 ("If this Court does not dismiss the action . . . Movants will likely move to disqualify the U.S. Attorney's Office for the Eastern District of Kentucky."), *with* R. 258 at 13 ("The minimum remedy for violation of a subject's attorney-client privilege requires a new prosecutorial and investigative team.").]

As explained above, the Movants have not met their burden of establishing a privilege violation. Even if they had, they do not provide any legal support for their assertion that dismissing the U.S. Attorney's Office is an appropriate remedy, let alone the "minimum remedy." [R. 258 at 13.] The remedy must be "tailored to the injury suffered." *Morrison*, 449 U.S. at 364. There is no indication that dismissal of the prosecution team is an appropriately tailored remedy, especially because there is no identification of any exposure to privileged materials. Because the Movants arguably reserve the right to make this request later, the Court denies the Motion to Dismiss without prejudice to the extent that it seeks disqualification of the prosecution team. The Movants are notified that the Court will not consider this extreme remedy without proof of a privilege violation and legal support for disqualifying the prosecution team as a remedy.

**F**

Mr. Grenkoski's Motion to Dismiss included an additional section titled "Objections Based Upon Privacy and Privilege Considerations." [R. 362 at 14-16.] This section is copied from another motion he filed requesting a stay of his obligations under the discovery protocol while objections to the protocol were pending. [R. 351 at 3-4.] That motion was resolved by the Magistrate Judge. [R. 365.] It is unclear why this was included in the Motion to Dismiss and whether Mr. Grenkoski is seeking any further relief. Because this request has been resolved, this portion of the motion to dismiss is denied as moot.

**III**

The Court must ensure that the "application of the privilege [does] not exceed that which is necessary to effect the policy considerations underlying the privilege." *In re Grand Jury Investigation No. 83–2–35,* 723 F.2d 447, 451 (6th Cir. 1983). Quite simply, the Movants' request to dismiss the Indictment is unfounded because no violation or resulting prejudice has been established. Further, two mechanisms remain in place protecting their privilege. Counsel currently has the opportunity to challenge the Government's filter determinations [*see* R. 291], preventing disclosure to the other Defendants and use at trial. The Movants may also move to suppress any privileged materials or object to their introduction at trial. Accordingly, it is hereby **ORDERED** as follows:

1. The Motions to Dismiss the Indictment **[R. 258; R. 362]** are **DENIED**, except;

2. The Motions to Dismiss the Indictment **[R. 258; R. 362]** are **DENIED WITHOUT PREJUDICE** to the extent they seek disqualification of the prosecution team, and;

3. Part D of Defendant Grenkoski's Motion to Dismiss **[R. 362 at 14-16]** is **DENIED AS MOOT**;

4. Defendant Herrell's Motion to Join the Motion to Dismiss **[R. 274]** is **GRANTED**, but he is likewise afforded no relief, and;

5. Defendant Herrell's Motion to Join **[R. 354]** is **GRANTED** to the extent it seeks to join Defendant Taylor and Barnett's Reply [R. 345].

This the 13th day of October, 2022.

Gregory F. Van Tatenhove
United States District Judge