UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 6:21-cr-00013-GFVT-HAI |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ROBERT TAYLOR, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court on the United States's Motion to limit expert testimony. [R. 574.] The United States seeks to restrict the testimony of Dr. James Patrick Murphy and Dr. Richard G. Soper under the Federal Rules of Evidence and Federal Rules of Criminal Procedure. *Id.* In addition, the Government requests permission for its motion to exceed twenty-five pages and numerous Defendants move to join Ms. Barnett or Dr. Herrell's responses. [R. 573; R. 577; R. 578; R. 580; R. 581; R. 582; R. 583.] For the reasons below, the Motions to Join [R. 577; R. 578; R. 580; R. 581; R. 582; R. 583] are **GRANTED**, the Motion for Leave to File Excess Pages [R. 573] is **GRANTED**, and the Motion to exclude or limit expert testimony [R. 574] is **GRANTED IN PART AND DENIED IN PART**.

**I**

The Indictment in this matter charges eleven Defendants with twenty-seven counts arising from their practices at EHC Medical Offices, a medical clinic in Tennessee. [R. 1.] Eight of the defendants were physicians who provided treatment at EHC. *Id.* at 7. The indictment alleges that all of the Defendants were involved in a conspiracy to violate the

Controlled Substances Act by issuing prescriptions without a legitimate medical purpose outside of the usual course of professional practice. [R. 1 at 7-8.] It also charges conspiracies to make false statements in connection with health care benefit programs, defrauding health care benefit programs, and various financial crimes. *Id.* at 8-32.

The United States seeks limitations on the expert testimony of Dr. Murphy and Dr. Soper. [R. 574-2; R. 574-3.] Defendant Taylor, who has pled guilty, retained these experts. *See id.* The Government indicates that the Defendants proceeding to trial—Barnett, Herrell, Grenkoski, Misra, Bidawid, and Cirelli—notified it of their intent to call these witnesses. [R. 574 at 1; R. 595 at 1 n.1.] Dr. Murphy is a physician specializing in anesthesiology, pain medicine, and addiction medicine. [R. 574-2 at 2.] Dr. Soper's disclosure does not identify his practice area. [R. 574-3.] Both provided their opinions on EHC's treatment practices. [R. 574-2; R. 574-3.]

## II

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 thus directs trial judges to exclude unreliable expert testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (describing a trial judge's responsibility as a "gatekeeping role" for expert testimony). At the discretion of the trial court, expert testimony is admissible if the testimony satisfies three requirements: (1) the expert is qualified, (2) the

testimony is relevant, and (3) the testimony is reliable.  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).

The proponent of expert testimony must satisfy these requirements by a preponderance of the evidence.  *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).  But the Court cannot "impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014).  Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  As a result, the rejection of expert testimony "is the exception, rather than the rule."  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530.

## A

First, the Government asks the Court to prevent Dr. Murphy from testifying about certain aspects of the "usual course of professional practice."  [R. 574 at 8-15.]  The indictment charges all eleven defendants with a conspiracy to violate the Controlled Substances Act.  [R. 1 at 7-8.] A physician violates the CSA if they issue a prescription without a legitimate medical purpose and outside of the usual course of professional practice.  21 C.F.R. § 1306.04(a).

Dr. Murphy's report includes inadmissible testimony about the *legal* meaning of the term "usual course of professional practice."  He compares the "usual course of professional practice" to the "standard of care," stating that they are "simply not the same" and that violating the standard of care does not constitute a CSA violation.  [R. 574-2 at 5.]  He also states that the "usual course" encompasses a range of physician skill from minimal competence or incompetence to best practices.  *Id.*

3

The Government contends that "none of this is proper expert testimony" because it provides a legal definition of an element of the offense to the jury.  [R. 574 at 12.]  The Government is correct.  "An expert may not state his or her opinions as to legal standards . . ." *United States v. Gordon*, 493 Fed. App'x 617, 626 (6th Cir. 2012) (quoting *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998)).  "Expert testimony on the law is excluded." *Id.* (quoting *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984)).  In fact, the Middle District of Tennessee recently prevented Dr. Murphy from providing a legal definition of the "usual course of professional practice."  *United States v. La*, 2022 WL 2707884 at *1 (M.D. Tenn. July 12, 2022) ("[A] number of sections in Dr. Murphy's report discuss legal matters that are both beyond his own expertise and outside the boundaries of what any expert witness would be permitted to address.").

The Defendants argue that the testimony is proper because experts can testify about the usual course of professional practice for issuing prescriptions.  [R. 576 at 5; R. 579 at 2.]  The Sixth Circuit has squarely decided that an opinion on the legitimate medical purpose for prescriptions "does not carry with it a 'separate, distinct and specialized meaning' from its medical counterpart" and thus may be admitted.  *United States v. Volkman*, 797 F.3d 377, 389 (6th Cir. 2015) (citing *Torres v. Cnty. Of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)); *see also United States v. Kirk*, 584 F.2d 773, 785 (6th Cir. 1978) (allowing testimony relating to the "generally acceptable standards of medical practice for issuing prescriptions").  The Court recognized this principle when it denied the Defendants' motion to exclude the Government's expert testimony about the usual course.  [R. 527 at 7.]  It acknowledged that the parties may present testimony on what conduct falls within the usual course of professional practice.  *Id.*

But defining the *legal* meaning of the term is different than describing the conduct that satisfies the term.  Like the Government, the Defendants may use their experts to show "how doctors generally ought to act."  [R. 576 at 7 (quoting *United States v. Feingold*, 454 F.3d 1001, 1007 (6th Cir. 2006)).]  They cannot use their experts to legally define the term "usual course of professional practice" by comparing it to the civil "standard of care" or explaining the range of competency which falls within it.  Allowing such testimony would infringe on the Court's province to explain what the law is.  *See Zipkin*, 729 F.2d at 387.

The Court grants the Government's request to prevent Dr. Murphy from providing a legal definition of the "usual course of professional conduct."  Having determined that the testimony is inadmissible, the Court need not address the Government's argument that Dr. Murphy's description is irrelevant and unreliable.  [R. 574 at 13-15.]

**B**

Second, the Government asks the Court to exclude Dr. Murphy and Dr. Soper's testimony regarding the Defendants' intent.  [R. 574 at 15-16.]  Dr. Murphy's report states that the EHC physicians' conduct was consistent with "health care providers whose intent it is to care for patients and alleviate suffering."  [R. 574-2 at 26.]  He concluded that the Defendants' conduct was "in the usual course of professional practice, in an authorized manner, and for legitimate medical purposes, with the intent to improve the quality of their patients' lives."  *Id.* at 27.  Dr. Soper's report states that in his "medical opinion," the Defendants "were acting with honest good faith and reasonable intentions to provide life saving and harm reducing medical care . . ."  [R. 574-3 at 16.]

The Government argues that this testimony violates Federal Rule of Evidence 704(b), which prevents expert testimony about whether the Defendant had "a mental state or condition

5

that constitutes an element of the crime charged or of a defense." [R. 574 at 15 (quoting Fed. R. Evid. 704(b)).] An expert cannot testify about the overarching question of guilt or innocence, but may provide testimony that suggests the answer "or that give[s] the jury all the information from which it can draw inferences as to the ultimate issue." *Volkman*, 797 F.3d at 388 (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)).

One of Dr. Murphy's statements about intent is admissible. He states that the Defendants' conduct was "consistent with what I expect of health care providers whose intent is to care for patients." [R. 574-2 at 26.] An expert can opine generally that the goal of actions taken within the usual course of professional practice is to provide care. *See United States v. Gallion*, 257 F.R.D. 141, 155 (E.D. Ky. 2009) ("[O]pinions that draw the ultimate conclusion regarding whether a defendant had the requisite intent to commit the crime charged are inadmissible, but opinions from which the jury can infer intent are admissible."). He can then compare the Defendants' conduct to that of a physician operating within the usual course. *See id.* Dr. Murphy's statement compares the Defendants' conduct to that of a physician acting within the usual course and notes that such a physician's intent would be to provide care. This statement does not go to the ultimate issue of the Defendants' state of mind because there is a layer of inference between the statement and the conclusion. *See id.*

However, the other statements the Government identified do go to the ultimate issue of the Defendants' states of mind and are inadmissible. Dr. Murphy stated that in his medical opinion, the Defendants' prescribing was "with the intent to improve the quality of their patients' lives." [R. 574-2 at 27.] Dr. Soper stated that the Defendants were "acting with honest good faith and reasonable intentions to provide lifesaving and harm reducing medical care." [R. 573-3

at 16.]  Both conclusions are inadmissible because they directly opine about the Defendants' own mental states.  Fed. R. Evid. 704(b).

Ultimately, the experts may testify about the intent of a physician operating within the usual course of professional practice but may not testify about the Defendants' own intentions. The Government's request to exclude references to intent is denied as to Dr. Murphy's first statement about conduct but granted as to his and Dr. Soper's statements about intent.

### C

Next, the Government asks to exclude opinions Dr. Murphy and Dr. Soper provided about aspects of providing addiction medicine.  [R. 574 at 16-20.]  It claims that these opinions are irrelevant and many constitute impermissible arguments for jury nullification.  Proffered expert testimony must be relevant to be admissible.  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529.  Testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.* (quoting Fed. R. Evid. 702).

### 1

The Government's request to exclude Dr. Murphy's opinions on prior authorizations is premature.  Count 4 charges some of the Defendants with a conspiracy to commit wire and health care fraud by submitting fraudulent claims.  [R. 1 at 48-53.]  Addressing this charge, Dr. Murphy's report states that prior authorization requirements "have become very problematic," "restrict[] patient access," and are "opaque," "unpredictable," and "very frustrating."  [R. 574-2 at 10-11.]  The Government argues that these claims "have no bearing on any fact at issue," so they "would only relate to a nullification argument—namely that committing fraud is acceptable because insurance policies are frustrating to deal with."  [R. 574 at 17.]

This challenge is better addressed at trial.  Parties cannot argue for, or present evidence

supporting, jury nullification.  *See United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988).

Therefore, the Defendants cannot elicit testimony suggesting that the charged offense is

excusable because of their frustrations with prior authorizations.  But the testimony may satisfy

another purpose.  The Defendants state that they are offering this testimony to counter "red flag"

evidence and explain why a physician may not want to accept insurance.  [R. 576 at 10.]

Accordingly, the propriety of this testimony will be clearer at trial.  The Court denies the

Government's request to exclude opinions about prior authorizations but it may re-raise the issue

at trial if appropriate.

### 2

Dr. Murphy's similar opinions on urine drug testing are improper.  Count 5 charges

certain defendants with a conspiracy to commit health care and wire fraud by submitting

fraudulent UDT claims.  [R. 1 at 43-57.]  Dr. Murphy's report states that "the only justification"

to limit UDT "would be to save money."  [R. 574-2 at 13.]  The Government argues that this

claim is irrelevant and unhelpful.  [R. 574 at 18-19.]  The Defendants claim that this testimony is

relevant because Dr. Murphy states that EHC's testing was medically necessary and that the only

reason to limit it is to save money.  [R. 576 at 12.]

It is unclear how Dr. Murphy's statement that the only reason to limit UDT is to save

money could be relevant.  As the Government argues, "the Defendants fail to elaborate on why a

putative motive to limit UDT has any bearing [on] the necessity of the tests."  [R. 595 at 7.]  Dr.

Murphy may testify that he believes that the tests were medically necessary and that

reimbursement requests were improperly denied.  *See United States v. Bertram*, 900 F.3d 743,

747 (6th Cir. 2018).  But his statement that limiting UDT is only intended to save money does

not make any fact more or less likely and is unhelpful to the jury.  Dr. Murphy also provides no

basis on which he can opine about the intent of the entities denying such requests.  Accordingly, the Court grants the Government's request to exclude Dr. Murphy's statement about limiting UDT.

### 3

The experts' statements about barriers to opioid use disorder treatment are not appropriate for pretrial exclusion.  Dr. Murphy stated that federal buprenorphine requirements make it difficult for patients to find providers and medication and that the prior authorization requirement is a barrier to buprenorphine treatment.  [R. 574-2 at 13-14.]  Dr. Soper states that "many levels" of barriers prevent opioid users from obtaining treatment.  [R. 574-3 at 2.]  The Government recognizes that the experts can testify about "the legitimate use of medications in the treatment of opioid use disorder" but asks the Court to bar suggestions that these difficulties justify the charged offenses.  [R. 574 at 19.]  It argues that any such suggestion is tantamount to arguing for jury nullification.  *Id.*

It does not appear that the Defendants intend to elicit such a suggestion.  [R. 576 at 13.] They emphasize that Dr. Murphy's opinion is not that these barriers excuse the Defendants' failure to adhere to medical standards.  *Id.*  Rather, his statements about barriers to access contribute to his conclusion that the medications were medically necessary.  [R. 574-2 at 13-14.] He specifically opines that the Defendants' buprenorphine prescriptions were "medically necessary, if for no other reason than . . . allow[ing] access to buprenorphine."  [R. 574-2 at 14.] Therefore, his statement does not advocate for jury nullification.  An argument for jury nullification would be using barriers to access to justify a failure to adhere to medical standards. In contrast, Dr. Murphy believes that those barriers help establish that the prescriptions were proper.  The Government may disagree that allowing access to buprenorphine does not make a

prescription medically necessary.  But the proper venue to make that argument is through cross-examination or the introduction of its own expert testimony.  The Government's request to exclude Dr. Murphy's statements about barriers to access is denied.

**4**

Dr. Soper's low threshold theory is admissible if he ties it to the usual course of professional practice during the indictment period.  Dr. Soper references a "growing body of evidence" supporting "low threshold" buprenorphine treatment, a "harm-reduction" based philosophy of providing wide and easy access to the drug.  [R. 574-3 at 3.]  The Government seeks exclusion because Dr. Soper (1) does not compare this theory to accepted medical standards, (2) does not relate the theory to EHC's practices, (3) and does not identify the evidence supporting the theory.  [R. 574 at 23-24.]  The Defendants claim that this testimony is relevant to the legitimate medical purpose and usual course of professional practice and that the Government's arguments are premature.  [R. 576 at 16.]

The Government's objections are more appropriate for trial.  Dr. Soper may testify about the existence of the low-threshold theory so long as the testimony is relevant to the usual course of professional practice during the indictment period.  The Government may cross-examine Dr. Soper about the theory's acceptance and influence on the "usual course."  However, Dr. Soper may not testify that this theory justifies a deviation from accepted medical practices.  The report does not make such a suggestion and the Defendants do not indicate that they will elicit such testimony.  [R. 574-2 at 13-14; R. 576 at 16-17; R. 579 at 4-5.]  Accordingly, the Government's request to exclude Dr. Soper's comments about "low threshold" treatment is denied.

10

**D**

The Government also asks the Court to exclude Dr. Murphy's conclusions about the EHC physicians' treatment practices.  Dr. Murphy concludes that the Defendants' actions were "consistent with the reasonable, acceptable, and appropriate use of buprenorphine/naloxone." [R. 574-2 at 15.]  The Government contends this conclusion is not reliable because the report does not identify the evidence he relied on or the basis of the opinion.  [R. 574 at 20.]  The Defendants disagree.  They reference Dr. Murphy's review of the Defendants' treatment of three particular patients and argue that the Government's objections go to the weight of the opinion, not its inclusion.  [R. 576 at 13-14.]

Dr. Murphy's conclusion is not so unsupported that it constitutes impermissible *ipse dixit*. Experts cannot provide testimony which relies on its own authority to reach a conclusion. *Nelson*, 243 F.3d at 254.  Expert opinion is impermissible *ipse dixit* when the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997).

Dr. Murphy's opinion does not present such an extreme gap.  His conclusion is explicitly based on "the evidence in this case." [R. 574-2 at 15.]  While he does not explain the evidence precisely supporting this conclusion, he reviewed "the medical records, prescription data, and other items related to" forty-three patients, the indictment, the Government's expert report, a letter from the Government regarding an expert, EHC's policies, and Kentucky's buprenorphine standards in preparing the report.  *Id.* at 3.  And his report is based on his experience as a specialist in addiction and pain medicine.  *Id.* at 2.  Later in the report, Dr. Murphy analyzed EHC's practices, referencing materials from the American Society of Addiction Medicine and the American Association of Physicists in Medicine.  *Id.* at 23-24.  He provided detailed analysis

11

of EHC's treatment of three patients. *Id.* at 24-26. The report generally provides a sufficient basis for Dr. Murphy's opinion and it is not impermissible *ipse dixit.*

For the same reasons, the disclosure was sufficient under Federal Rule of Criminal Procedure 16(b)(1)(C)(iii). It identified the bases and reasons for the opinion. Accordingly, the Government's motion to exclude Dr. Murphy's conclusion is denied.

### E

The Government also asks the Court to prevent Dr. Murphy from testifying about guidelines issued after the indictment period. His report references multiple medical guidelines about buprenorphine treatment and opioid use disorder published after the timeline covered by the Indictment. [R. 574 at 21.] The Government asks the Court "to limit Dr. Murphy's testimony to discussion of the standards in effect between 2013 and 2018." *Id.* The Defendants believe that these materials are "highly relevant to the Defendants' state of mind" because they were "develop[ed] with the input of expert practitioners like these Defendants." [R. 576 at 14.] Dr. Herrell's response adds that "the practice of medicine is fluid and is impacted and informed by past and future laws, guidelines, and policies." [R. 579 at 4.]

This testimony is admissible if Dr. Murphy can tie it to the usual course of professional practice during the relevant time period. These materials have some relevance if, as the Defendants indicate, those standards influence Dr. Murphy's understanding of the usual course of professional practice when the Defendants were issuing the allegedly unlawful prescriptions. [*See* R. 576 at 14; R. 579 at 4.] Their responses suggest that guidelines are, to some extent, reflective of developments in professional practice preceding their issuance. *Id.* The Government can contest this conclusion through cross-examination, but pretrial exclusion is not warranted because the later guidelines are relevant under the Defendants' theory.

12

The Government relies on *La* to support exclusion.  [R. 574 at 21-22.]  There, the Middle District of Tennessee prevented Dr. Murphy from giving similar testimony about changes in medical standards made in response to the coronavirus pandemic.  2022 WL 2707884, at *1.  It reasoned that "any such discussion is likely to confuse the jury more than it assists them, given that those changes in care were not in place at the time the relevant prescriptions were written."  *Id.*  The Court agrees that discussion of the materials presents some risk of jury confusion.  Because of this risk, Dr. Murphy's references to the materials must be focused on establishing the usual course of professional practice during the relevant time period.  The Government's request to exclude any reference to guidelines, policies, or law issued after the indictment period is denied.[1]

## F

The Government also asks the Court to prevent opinion testimony about EHC's treatment of particular patients who are not identified in the experts' reports.  The Government seeks exclusion of any undisclosed opinions because, having been undisclosed, they do not satisfy the Rule 16 disclosure requirement.  [R. 574 at 22, 28.]  Neither report indicates that the experts intend to testify about any particular patient not otherwise identified.  [R. 574-2; R. 574-3.]  But the Defendants argue that they should be permitted to elicit such testimony at trial.  [R. 576 at 14-16, 19.]  Federal Rule of Criminal Procedure 16(b)(1)(C)(iii) requires that an expert report contain a complete statement of all the opinions the witness will express.

In support of exclusion, the United States relied on *Anderson-Bagshaw* and *Robinson*.  [R. 574 at 22.]  In *Anderson-Bagshaw*, the Court prevented an expert from testifying whose

---

[1] The Government's "Omnibus" Motion in Limine is currently pending before the Court.  [R. 590.]  It seeks pretrial exclusion of introduction or any reference to post-December 2018 guidelines.  *Id.* at 3-4.  That request is broader than the one at hand, which is limited to preventing Dr. Murphy from referencing these materials.  [R. 574 at 21-22.]  This ruling is limited to the Government's motion to limit expert testimony.  [R. 574.]

disclosure was "extremely vague," did not identify her specific opinions, and provided only the vaguest bases for her opinions. *United States v. Anderson-Bagshaw*, 509 Fed. App'x 396, 410 (6th Cir. 2012). In *Robinson*, this Court prevented an expert witness from presenting an opinion which was not disclosed in his expert report. *United States v. Robinson*, 2015 WL 12805168, at *5 (E.D. Ky. Apr. 16, 2015).

The Defendants compare the reports to Dr. Murphy's report in *La*, in which the Court refused to exclude his conclusions about the propriety of prescribing practices. [R. 576 at 15 (citing 2022 WL 2707884, at *2).] It found that there is no requirement that an expert conduct patient-by-patient analysis to reach conclusions about the defendant physician's prescribing practices, regardless of "whether one finds that line of thinking persuasive." *La*, 2022 WL 2707884, at *2. They also argue that the reports are not as vague as those in *Anderson-Bagshaw*. [R. 576 at 15.]

*Anderson-Bagshaw* and *La* are both inapposite. In *La*, the Government sought exclusion of Dr. Murphy's conclusions about the defendants' prescribing practices. 2022 WL 2707884, at *2. Here, the Government asks the Court to prevent the experts from testifying about specific patients whom they did not analyze in their reports. [R. 574 at 22, 28.] Similarly, in *Anderson-Bagshaw*, the Sixth Circuit affirmed complete exclusion of an expert witness whose report was "extremely vague." 509 Fed. App'x at 410. The Defendants are correct that their experts' reports are not as vague. But appropriately, the requested exclusion is not as extreme. The Government only seeks to prevent the defense experts from testifying about specific patients who they did not analyze in their reports. [R. 574 at 22.]

Ultimately, this request is comparable to that in *Robinson.* There, the Court prevented the expert from "present[ing] an opinion at trial that he did not previously disclose in his expert

14

report." 2015 WL 12805168, at *5.  The Government's expert had analyzed thirty treatment dates, compared to the defense expert's six.  *Id.*  The defense implied that their expert had "formed some opinions about [the Defendant's] practice that [were] not outlined in his report." *Id.*  The Court precluded him from testifying about such opinions because they were not disclosed.  Similarly here, Drs. Murphy and Soper cannot testify about the Defendants' treatment of specific patients who they did not identify in their reports.  The Government's request to exclude undisclosed opinions is granted.

**G**

Finally, the Government seeks exclusion of certain factual assertions by Dr. Soper.  His report contains factual assertions about EHC, such as their patient population, average length of treatment, staff turnover, and adverse events.  [R. 574-3 at 4-5.]  The Government seeks exclusion of these claims because the report does not disclose their basis.  [R. 574 at 26.]  The Defendants argue that "the experts have gathered facts from data available to both the Government and the Defendants, [so] [t]he government can cross-examine Dr. Soper about these assertions and present counter-evidence."  [R. 576 at 17-18.]

The majority of Dr. Soper's assertions are sufficiently supported.  His report states that he reviewed patient evaluations for all patients referenced in the Government's expert report and EHC's policy and procedure manuals.  [R. 574-3 at 8-9.]  This information could feasibly support his conclusions about the patient population, average length of treatment, staff turnover, and adverse events.  The Government can challenge how he reached those conclusions through cross-examination.

On the other hand, Dr. Soper's report does not identify any materials from which he could have drawn conclusions about DEA and state investigations.  He gives conclusory

statements about the outcomes of these investigations without citing a source.  [R. 574-3 at 4.] EHC manuals and patient files would not support his assertions about those investigations. Accordingly, there is no basis for Dr. Soper's assertions about these investigations and the Court will prevent him from providing factual testimony about them.

### III

Some of the Government's requests for pre-trial exclusion are warranted.  Specifically, the Court grants its request to exclude: Dr. Murphy's statements about the legal meaning of the "usual course of professional practice," Dr. Murphy and Dr. Soper's statements about the Defendants' own intent, Dr. Murphy's statements about limiting UDT, undisclosed opinions about EHC's treatment of specific patients, and Dr. Soper's factual assertions about DEA and state investigations into EHC.  The remainder of its requests are denied.  The appropriate means for Government to dispute the remaining testimony is not exclusion but thoughtful cross-examination and the presentation of counter-evidence.  *See Daubert*, 509 U.S. at 596.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The United States' Motion for Leave to exceed the Court's page limit **[R. 573]** is **GRANTED**;

2. Defendants Grenkoski, Cirelli, Herrell, Misra, and Bidawid's Motions to Join **[R. 577; R. 578; R. 580; R. 581; R. 582; R. 583]** are **GRANTED**; and

3. The United States's Motion in Limine **[R. 574]** is **GRANTED IN PART** and **DENIED IN PART**.

This the 18th day of April, 2023.

Gregory F. Van Tatenhove
United States District Judge